## Case No. 11,229.

### The PLOUGHBOY.

[1 Brown, Adm. 48.] [1]

District Court, D. Michigan. Feb., 1859.

REVENUE LAWS—RECEIVING GOODS UNLADEN WITHOUT PERMIT.

1. Under section 28 of the act of 1799 [1 Stat. 648], the reception by one vessel of goods unladen from another without a permit, subjects the receiving vessel to forfeiture irrespective of a fraudulent intent on the part of her officers.

2. The fact, that efforts were made to find an officer, which were unsuccessful on account of the lateness of the hour, and that the master was impatient to proceed, furnish no legal excuse.

Information under section 28 of the act of 1799, for receiving a quantity of Canadian liquors from the bark Fame, while lying moored at Port Huron, without a permit from an officer of the customs. [There was a decree of condemnation, under section 1, Act March, 1821. Case No. 4,633.]

Joseph Miller, Dist. Atty., for the United States.

Levi Bishop, for claimant.

WILKINS, District Judge. The charge embraced in the first and second counts of the information is clearly established by the proofs. It is in substance that after the ar-

[1] [Reported by Hon. Henry B. Brown, District Judge, and here reprinted by permission.]

rival of the Fame at Port Huron, the goods were unladened from her without license, and were put on board and received into the Ploughboy, Port Huron not being the proper place for the discharge of the cargo of the Fame.

Section 28 of the act of 1799, must be construed in connection with the preceding section, and consequently inhibits under penalty of the forfeiture of the vessel, the reception of the cargo by and into any other ship before reaching her port of destination. Port Huron was not such port. The cargo was transferred from one vessel to the other at midnight, without authority or permit.

By the written admission on file, it appears the bark Fame left the port of Amherstburg, Canada, with a cargo of whisky, brandy and gin, of Canadian manufacture, bound as appears by her manifest for the port of Detroit. The manifest or "report outwards" duly authenticated by the British collector, simply shows the fact that the bark Fame with her cargo left for Detroit on the day mentioned. She passed Detroit without reporting, pursuing her course up the river to Port Huron, and there moored at the dock and waited for the Ploughboy. On her arrival, the cargo of the Fame was transshipped and received on board the Ploughboy, and by her taken to and discharged at Port Sarnia in Canada, nearly opposite Port Huron. The Ploughboy was a British vessel running between Detroit and Goderich in Canada, occasionally stopping at Port Huron and Sarnia. The owner of the liquors was also the owner of the Ploughboy, and kept liquors for sale both at Goderich and Sarnia, and I have no doubt from the testimony, that the liquors were intended to be consigned to the Canadian ports, and were not designed for the United States. But such intention was not expressed in the manifest —an omission resulting from the obvious design of the consignee to have them transshipped to his own vessel, which was expected to meet the Fame on the British side of the channel. It was admitted that the Fame delivered no manifest at Detroit, her port of destination, and it is in proof, that after her seizure at Port Huron it was, by the deputy collector there, transmitted by mail to the collector at Detroit. The letter of the law then was clearly violated by the Ploughboy, there being no permit to unlade the Fame and receive her cargo, from any officer of the customs, and the language of the statute is so positive that notwithstanding the apparent lack of a fraudulent intent, I must reluctantly direct a decree of condemnation. The law prohibits the reception of goods by one vessel from another, before reaching the port of destination, without a permit or license. The officers of the Ploughboy knew the necessity of a permit, and endeavored to find a custom-house officer, but were unable to do so on account of the lateness of the hour. The statute declares that the cargo of no

such vessel shall be unladened or received into any other ship for any purpose whatever, without the specified authority. This excludes the defense of innocence of intention. The impatience of her officers to proceed on their way, cannot be embraced by judicial construction in the exception of the statute as to accident or necessity. If no officer could be found at that late hour, it was the duty of the master to wait until morning. The evidence of an understanding with the former collector cannot be recognized by the court as modifying the statute, although it certainly is an excuse addressing itself to the clemency of the government for a remission of the forfeiture. The evident consignment of the cargo to Sarnia—the design to tranship for that purpose, the supposed arrangement with a former collector as to arrivals and departures at Port Huron, the arrival of the Ploughboy in the night time on her trip to Goderich—the search for the officer at midnight, in order to procure a permit, tend strongly to acquit the master of any intent to violate the law, but furnish no legal basis for an acquittal under the provisions of the statute. Decree of condemnation.

The forfeiture decreed in this case, was afterwards remitted upon payment of a fine of $200 and costs.